William M. Moran, Esq.
Jennifer S. Feeney, Esq.
Erik B. Weinick, Esq.
OTTERBOURG P.C.
230 Park Avenue
New York, New York 10169-0075
(212) 661-9100

*Counsel to Melanie L. Cyganowski, as Receiver*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------X
In re                                                                :
                                                                     :  Chapter 7
MARK A NORDLICHT,                                                    :
                                                                     :  Case No. 20-22782-rdd
                              Debtor.                                :
---------------------------------------------------------------------X
MELANIE L. CYGANOWSKI, AS RECEIVER, BY AND FOR:
PLATINUM PARTNERS CREDIT OPPORTUNITIES MASTER:
FUND LP, PLATINUM PARTNERS CREDIT OPPORTUNITIES:
FUND (TE) LLC, PLATINUM PARTNERS CREDIT:
OPPORTUNITIES FUND LLC, PLATINUM PARTNERS CREDIT:
OPPORTUNITIES FUND INTERNATIONAL LTD., PLATINUM:
PARTNERS CREDIT OPPORTUNITIES FUND INTERNATIONAL:
(A) LTD., and PLATINUM PARTNERS CREDIT OPPORTUNITIES:  Adv. Pro. No.
FUND (BL) LLC,                                       :
                              Plaintiffs,            :
                                                     :
        -against-                                    :
                                                     :
MARK A. NORDLICHT,                                   :
                                                     :
                              Defendant.             :
---------------------------------------------------------------------X

**ADVERSARY COMPLAINT**
**OBJECTING TO DISCHARGE**

Melanie L. Cyganowski, as Receiver (the "Receiver"), by and for the above-captioned creditors, (i) Platinum Partners Credit Opportunities Master Fund LP, (ii) Platinum Partners Credit Opportunities Fund (TE) LLC, (iii) Platinum Partners Credit Opportunities Fund LLC, (iv)

Platinum Partners Credit Opportunities Fund International Ltd., (v) Platinum Partners Credit Opportunities Fund International (A) Ltd. and (vi) Platinum Partners Credit Opportunities Fund (BL) LLC (collectively, the "Receivership Entities"), through her counsel, Otterbourg P.C., hereby brings this adversary proceeding against Mark A. Nordlicht, and alleges as follows:

## NATURE OF THE ADVERSARY PROCEEDING

1. This is an adversary proceeding commenced by the Receiver under 11 U.S.C. § 727(a)(4)(A). Specifically, the Receiver is objecting to the discharge of Mark A. Nordlicht ("Debtor") for fraudulent conduct.

## PARTIES

### Plaintiffs

2. Melanie L. Cyganowski is the Receiver for the Receivership Entities and asserts the claims hereunder by and for the following creditors.

3. Receivership Entity Platinum Partners Credit Opportunities Master Fund LP ("PPCO Master Fund") is and, at all material times hereinafter mentioned, was a limited partnership organized under Delaware law with its principal place of business in New York, New York.

4. Receivership Entity Platinum Partners Credit Opportunities Fund (TE) LLC is and, at all material times hereinafter mentioned, was a limited liability company organized under Delaware law with its principal place of business in New York, New York.

5. Receivership Entity Platinum Partners Credit Opportunities Fund LLC is and, at all material times hereinafter mentioned, was a limited liability company organized under Delaware law with its principal place of business in New York, New York.

6. Receivership Entity Platinum Partners Credit Opportunities Fund International Ltd. is and, at all material times hereinafter mentioned, was a Cayman Islands exempted company.

7. Receivership Entity Platinum Partners Credit Opportunities Fund International (A) Ltd. is and, at all material times hereinafter mentioned, was a Cayman Islands exempted company.

8. Receivership Entity Platinum Partners Credit Opportunities Fund (BL) LLC is and, at all material times hereinafter mentioned, was a limited liability company organized under Delaware law with its principal place of business in New York, New York.

9. The Receivership Entities are members of the "PPCO Funds," one of three groups of funds co-founded by the Debtor.

**Defendant**

10. Debtor Mark A. Nordlicht is an individual residing in New Rochelle, New York.

11. Debtor was a co-founder and controlling principal of the Receivership Entities until on or about December 19, 2016, when an eight-count indictment was unsealed in the United States District Court for the Eastern District of New York commencing a criminal action against Debtor and his Platinum counterparts, for securities fraud, investment adviser fraud, securities fraud conspiracy, investment adviser fraud conspiracy and wire fraud conspiracy for defrauding investors (the "Criminal Action").

12. Also on December 19, 2016, the Securities and Exchange Commission ("SEC") commenced a civil action in the United States District Court for the Eastern District of New York against the defendants named in the Criminal Action asserting certain securities laws violations (the "Receivership Action"). In connection with filing the Receivership Action, the SEC sought

and obtained the appointment of a Receiver for the Receivership Entities with Debtor's consent and that of the other defendants in the Receivership Action.

13. Prior to the Criminal and Receivership Actions, Debtor served as the Chief Investment Officer of the PPCO Funds, and was responsible for the PPCO Funds' investment decisions and valuation of assets.

14. Debtor was also a member of PPCO Master Fund's General Partner, and the managing member of Platinum Credit Management L.P., the portfolio manager for PPCO Master Fund, PPCO Onshore Feeder Fund, PPCO Fund International, PPCO Fund International A and PPCO Fund TE (the "Portfolio Manager").

**Other Relevant Individuals and Entities**

15. Dahlia Kalter is married to Debtor ("Ms. Kalter"). She, like her father before her, is an estate attorney, residing in New Rochelle, New York.

16. Upon information and belief, 16th Avenue Associates LLC ("16AA") is a Delaware limited liability company, with its principal place of business in New York, New York. 16AA is nominally managed by Ms. Kalter.

17. Upon information and belief, 535 WEA Group LLC ("535 WEA") is a Delaware limited liability company with a registered address of 245 Trenor Drive, New Rochelle, New York, which is Debtor and Ms. Kalter's primary residence.

18. Upon information and belief, OBH 2308 LLC ("OBH 2308") is a Florida limited liability company, also with a registered address of 245 Trenor Drive, New Rochelle, New York. Ms. Kalter is the sole member of OBH 2308.

19. Upon information and belief, NYFLA Investors LLC ("NYFLA") is a New York limited liability company with a registered address of 7 Times Square, New York New York. NYFLA was founded with Debtor's father as the entity's managing member.

## JURISDICTION

20. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, 11 U.S.C. § 727, and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

21. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I) and (J).

22. Venue is proper in this judicial circuit pursuant to 28 U.S.C. section 1409(a).

## DEBTOR'S HISTORY OF FRAUDULENT ACTIVITY

23. In or about 2003, Debtor co-founded the "Platinum Funds," a Manhattan-based family of hedge funds that consisted of PPCO, Platinum Partners Liquid Opportunity Master Fund, L.P. ("PPLO") and Platinum Partners Value Arbitrage Fund, LP ("PPVA").

24. The PPCO Funds were marketed as a single-strategy group of funds whose business was to originate loans and made equity investments in various industries, including consumer finance, litigation, metals and mining, oil and gas, alternative energy, retail energy, life settlements and asset-based finance.

25. In contrast, the PPVA Funds were marketed as a group of multi-strategy funds that included long/ short fundamental equity trading, asset-based financing in energy, mining, and other industries, energy-related and Asia-based arbitrage opportunities, and event-driven investing in corporations.

26. At all relevant times, the Platinum Funds shared overlapping founders and management. For example, Debtor was the co-chief investment officer of PPVA and managing member of Platinum Management, which in turn was the General Partner of PPVA.

27. As CIO of the Platinum Funds, Debtor was primarily responsible for the Platinum Funds' investment decisions and the valuation of their assets.

28. For many years, Debtor used his ability to overvalue the Platinum Funds' assets to extract significant management and incentive fees for his own personal enrichment and that of Platinum Fund insiders—most of them friends and family of Debtor—at the expense of the Platinum Funds and their investors and creditors.

29. Debtor achieved this by systemtically overvaluing illiquid and increasingly distressed assets held by the Platinum Funds—specifically, investments in, and loans to, portfolio companies, under increasing duress were consistently valued above their fair market value.

30. Debtor's fraudulent overvaluation of assets, combined with investors' requests for redemption within the short timeframes permitted by the Platinum Fund, resulted in a liquidity crisis at the Platium Funds by 2013. PPVA, which held primarily highly illiquid "Level 3" assets, was particularly affected.[1]

31. Nevertheless, Debtor was incentivized to "keep up appearances" and continue overreporting the Platinum Funds' income to insure the payment of high fees to the Platinum Portfolio Managers. Debtor kept up appearances by disregarding the PPCO Funds' own fragile

---

[1] PPVA is now in liquidation in the Cayman Islands as a result of Debtor's malfeasance

financial position and directing Platinum insiders to use PPCO to prop up the even more precarious PPVA.[2]

32. But inter-fund transfers could not conceal Platinum's growing liquidity crisis forever, so in 2013 Debtor conspired with his partners and created "Beechwood," a reinsurance company and investment adviser, to gain access to previously unavailable institutional investment funds for the benefit of Platinum's and Beechwood's overlapping owners and officers, which funds Debtor and his cohorts used to invest in the failing Platinum-related investments.

33. Between 2013 and 2014, Beechwood successfully entered into reinsurance and investment management agreements with institutional investors that resulted in a total of $912 million in institutional funds. Immediately upon receipt of these funds, Debtor directed Beechwood to invest into the Platinum Funds and/or their portfolio companies, sitting in a hopelessly conflicted role as CIO and equity holder in the Platinum Funds, and one of the ultimate and most active owners of Beechwood.

34. Not long after, when the Platinum portfolio companies failed to meet their debt service obligations and Beechwood's institutional investors requested out of the poorly-performing Platinum assets, Debtor completely abdicated his fiduciary duties to the PPCO Funds and orchestrated a fraudulent multi-tranche transaction (the "PPCO Loan Transaction"), executed between December 21, 2015 and March 21, 2016, designed to dump the nonperforming

---

[2] For example, beginning in 2014, Debtor caused PPCO Master Fund to transfer cash to PPVA, take on toxic investments of PPVA, including positions with the failing oil and gas producer Black Elk Energy Offshore Operations LLC, and saddled PPCO with at least $30 million in loans to PPVA, a portion of which remains outstanding today.

7

instruments into PPCO Master Fund's portfolio, while stripping PPCO Master Fund of its most valuable assets.

35. As more fully set forth in the Receiver's Proof of Claim (Claim No. 12), in the PPCO Loan transaction, Debtor caused PPCO Master Fund to (a) borrow a total of approximately $69.1 million from Beechwood and its institutional investors (in part through trusts), and (b) purchase or discharge, from Beechwood and the institutional parties whose assets it managed, certain loans to distressed companies.

36. Although the distressed loans that Debtor caused PPCO to purchase/discharge in the PPCO Loan Transaction were worth only a fraction of the amount due under the loans, Debtor caused PPCO Master Fund to purchase/satisfy them for the full amount due under them.

37. The PPCO Loan Transaction benefitted Beechwood by allowing it to rid itself and the parties whose assets it managed of certain distressed loans, which in turn benefitted Debtor, who held a large ownership stake in Beechwood through numerous family members.[3] Meanwhile, PPCO Master Fund was left with worthless or nearly worthless assets—$69.1 of notes payable to it by three distressed companies, secured by liens on substantially all of the PPCO Funds' and their subsidiaries' assets.

38. As a direct result of the Debtor's fraudulent actions to strip assets from the PPCO Funds for the benefit of the Debtor and his family, the SEC recommended the appointment of a Receiver in the Receivership Action to, among other things, recover, liquidate, marshal, and preserve all assets of the Receivership Entities.

---

[3] Beechwood's majority ownership was held in trusts controlled by family members of Platinum's principals, including Debtor.

39. During the Receivership, the Receiver has also commenced litigation to, among other things, resolve the blanket liens placed on the PPCO Funds' assets due to Nordlicht's breaches. Ultimately, in July 2020, PPCO Master Fund entered into settlements with Beechwood's institutional investors, pursuant to which PPCO Master Fund was required to (i) make a payment of $14 million, and (ii) permit an allowed claim in the Receivership in the amount of $1 million, to settle portions of the remaining secured debt that Debtor caused PPCO to incur in the PPCO Loan Transaction.

## DEBTOR'S MISREPRESENTATIONS IN HIS BANKRUPTCY CASE

40. On June 29, 2020, Debtor filed a bankruptcy petition.

41. In his bankruptcy case, Debtor has continued his long-running pattern of fraudulent conduct, by filing false Schedules, lying under oath and knowingly deceiving the Chapter 7 Trustee.

### Debtor's False Schedules

42. In the Schedules to his bankruptcy petition, Debtor disclosed only $137,052 in assets, and represented that he and Ms. Kalter receive only $25,000 in monthly contributions from his mother for "tuition and other expenses." (Petition at 27).

43. Debtor swore, under penalty of perjury, that the statements contained in the Schedules were "true and accurate."

44. Upon information and belief, the statements in the Schedules were false.

45. According to the Declaration of Nathaniel J. Kritzer (ECF 51),[4] filed in Support of Richard Stadtmauer's Application for Order Pursuant to Fed. R. Bankr. P. 2004 and 11 USC 105(A) (ECF 49-50) (the "Krizer Decl."), in August 2019, Debtor's mother wrote a single check for $1.4 million, made out to Ms. Kalter, which is several times the amount that Mr. Nordlicht claimed in his petition— about $100,000 per month. (ECF 51-21).

46. Also according to the Kritzler Decl., 16AA paid approximately $1 million in legal fees for Debtor's personal lawyers in the thirteen months leading up to his bankruptcy filing. (ECF 51-4). Despite these generous distributions for his personal expenses, Debtor reported $0 in income other than the contributions from his mother. (Petition at 27).

47. Moreover, while Ms. Kalter is purportedly the managing member of 16AA, in a February 28, 2020 Affidavit, filed in the Supreme Court of New York, Westchester County, Ms. Kalter stated under oath that her primary remaining assets are 535 WEA and Trenor Trust, without any mention of 16AA, a significant asset with the funds to cover Debtor's millions of dollars in legal fees. *Stadtmauer et al. v. Nordlicht et al.,* Index. No. 51825/2020 (Sup. Ct. Westchester Cty.), Dkt. No. 72 (the "State Court Proceeding").

48. Upon information and belief, Ms. Kalter's ownership interest in 16AA is in name only. Debtor controls and manages 16AA.

49. Debtor also failed to disclose his ownership interest in an 8,400-square-foot luxury condominium on Manhattan's Upper West Side, located at 535 West End Avenue, No. 15 (the "New York Condo"), and held in name by 535 WEA.

---

[4] References to "ECF __" are to documents filed in the Debtor's bankrutpcy case.

50. According to the Option Agreement dated November 12, 2008, Debtor himself executed the option agreement to purchase the condominium while it was still under construction, for a payment of approximately $3.17 million. (ECF 51-26).

51. According to the Kritzler Decl. and to the Assignment and Assumption Agreement dated July 7, 2010, when development of the Manhattan Condo neared completion, Debtor assigned the Option Agreement and initial payment under the agreement to 535 WEA for no consideration. (ECF 51-27 & 51-28).

52. Upon information and belief, Debtor assigned the option agreement to 535 WEA for no consideration because 535 WEA is controlled by Debtor.

53. Indeed, according to 535 WEA's Application for Authority with the New York Department of State, the application was filed by PPLO—one of the three Debtor-controlled Platinum Funds. (ECF 51-29).

54. Moreover, after Debtor assigned the Manhattan Condo to 535 WEA, he continued to treat the Condo as his own. In December 2015, Debtor took out a $7.5 million loan from Hutton Ventures LLC ("Hutton"),[5] secured by a mortgage on (1) the New York Condo and (2) a 5,266-square-foot luxury condominium located at the Ritz-Carlton Bal Harbour in Miami Beach, Florida (the "Florida Condo"), which was held in name by OBH 2308.

55. Demonstrating Debtor's control over both Condos, the Hutton loan documents are signed twice by Debtor, as an "authorized signatory" for 535 WEA and OBH 2308. (ECF 51-

---

[5] Hutton Ventures LLC is a fund controlled by Murray Huberfeld, a co-founder of the Platinum Funds.

32). Interest Statements for the mortgages were also sent from Hutton directly to Debtor—not Ms. Kalter.

**<u>Debtors' Efforts to Conceal Assets</u>**

56. According to the Kritzler Decl., in January 2017, after Debtor was sued in an arbitration that ultimately resulted in an award of $15 million dollars, Hutton sold the $7.5 million loan secured by the Condos, together with the underlying mortgages on the properties, to NYFLA, which had been formed only days prior to the transaction. (ECF 51-48, 51-49, 51-50 & 51-51).

57. According to the Kritzler Decl., a few months later, in May 2017, the Florida Condo sold for $7.85 million and NYFLA released the Florida Condo from its mortgage for no consideration. (ECF 51-52 & 51-53).

58. Demonstrating Debtor's ownership and control of the Florida Condo, which was purportedly held by OBH 2308, an August 14, 2016 email shows Debtor enlisting a real estate agent for the sale of the property, stating that "he [Debtor would] want to get 8 [million] net worst case…" for the Florida Condo.

59. Moreover, according to the Kritzler Decl., Debtor's late father executed his will days after the Florida sale. The language of the will reveals that the mortgage transactions were directed and intended by Debtor to protect his assets from the reach of creditors.

60. The will provides that Debtor's Trust is not to be distributed to him until:

"[T]he first date that MARK is living and on which, for the six-month period prior to such date, (i) there were no lawsuits outstanding or brought or claims asserted against MARK, (ii) MARK was not in jail, the subject of a criminal or civil investigation or facing pending criminal charges, (iii) MARK had a positive net worth (not including in MARK's assets any undistributed income or principal of MARK's Trust), (iv) there were no outstanding liens or levies against MARK, and

(v) MARK was not delinquent on the payment of any outstanding obligations, including loans, credit card debt, utility bills and/or rent."

(ECF 51-54 at 16).

61. The will does not include similar provisions for Debtor's siblings, and Debtor did not disclose "Mark's Trust" in his bankruptcy petition.

62. Debtor's misstatements in his Schedules, and his efforts to conceal assets through the use of shell companies in the years leading up to his bankruptcy, were part of a larger scheme to frustrate a recovery by his creditors in this bankruptcy, the full extent of which will be revealed through discovery in this adversary proceeding.

63. Indeed, as Ms. Kalter admitted in the State Court Proceeding, she too, took certain actions to protect her family home in case her "husband's business ever went bad." (State Court Proceeding, Dkt. No. 72 at 4).

## AS AND FOR A CLAIM FOR RELIEF

### (Bankruptcy Code Section 727 (a)(4)(A))

64. The Receiver repeats each of the allegations set forth in paragraphs 1 through 63 above as if fully set forth herein.

65. During his bankruptcy, Debtor knowingly and fraudulently made numerous false oaths or accounts, including, but not limited to, failing to disclose in his Schedules, signed under penalty of perjury, (i) significant monthly contributions from his mother, in excess of $25,000 for "tuition and other expenses," (ii) payment by 16AA of approximately $1 million in legal fees to the Debtor's personal lawyers in the months leading up to his bankruptcy filing, (iii) a *de facto* ownership interest in an 8,400-square-foot luxury condominium on Manhattan's Upper West Side, and (iv) the Trust established in his late father's will.

66. The knowing omissions and false statements in the Schedules were part of a fraudulent scheme by the Debtor to conceal Estate assets from the Chapter 7 Trustee and his creditors and/or otherwise make it impossible for the Chapter 7 Trustee and his creditors to ascertain his financial condition or business transactions in the years prior to his bankruptcy proceeding.

67. By reason of the foregoing, under U.S.C. § 727(a)(4)(A), the Debtor's discharge should be denied.

**WHEREFORE**, the Receiver demands that a judgment be entered against the Debtor on the Receiver's Claim for Relief, denying the Debtor a discharge under Section 727(a)(4)(A) of the Bankruptcy Code.

Dated: New York, New York
December 7, 2020

Respectfully submitted,

By: */s/ Erik B. Weinick*
    Erik B. Weinick

William M. Moran, Esq.
Jennifer S. Feeney, Esq.
Erik B. Weinick, Esq.
OTTERBOURG P.C.
230 Park Avenue
New York, New York 10169
(212) 661-9100

*Counsel to Melanie L. Cyganowski, as Receiver*